IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRENCE CARTER,

    *Plaintiff*,

    v.

BALTIMORE CITY POLICE
DEPARTMENT, *et al.*,

    *Defendants*.

Civil No.: 1:24-cv-03057-JRR

## MEMORANDUM OPINION

Pending now before the court is Baltimore City Police Department ("BPD") and former Police Commissioner Michael Harrison's Motion to Dismiss Plaintiff's Amended Complaint. (ECF No. 30; the "Motion.")  The court has reviewed all papers; no hearing is necessary.  Local Rule 105.6 (D. Md. 2025).

## I.    BACKGROUND[1]

Plaintiff Terrence Carter brings this action alleging violations of his Fourth Amendment rights by Defendants.  (ECF No. 29 ¶ 1.)

### A.  The Aerial Investigation Research Program

The Aerial Investigation Research ("AIR") program is "a first-of-its-kind aerial surveillance program operated by the Defendants—[BPD] and Commissioner Michael Harrison." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 333 (4th Cir. 2021) ("*Leaders of a Beautiful Struggle III*").  More specifically:

> The AIR program uses aerial photography to track movements related to serious crimes. Multiple planes fly distinct orbits above Baltimore, equipped with [Persistent Surveillance Systems'

---

[1] For purposes of resolving the Motion, the court accepts as true all well-pled facts set forth in the Amended Complaint. (ECF No. 29.) *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

("PSS")] camera technology known as the "Hawkeye Wide Area Imaging System." The cameras capture roughly 32 square miles per image per second. The planes fly at least 40 hours a week, obtaining an estimated twelve hours of coverage of around 90% of the city each day, weather permitting. The [Professional Services Agreement ("PSA")] limits collection to daylight hours and limits the photographic resolution to one pixel per person or vehicle, though neither restriction is required by the technology. In other words, any single AIR image—captured once per second—includes around 32 square miles of Baltimore and can be magnified to a point where people and cars are individually visible, but only as blurred dots or blobs.

The planes transmit their photographs to PSS "ground stations" where contractors use the data to "track individuals and vehicles from a crime scene and extract information to assist BPD in the investigation of Target Crimes." "Target Crimes" are homicides and attempted murder; shootings with injury; armed robbery; and carjacking. Between 15 and 25 PSS contractors analyze the data, working in two shifts per day, seven days per week. The AIR program is not designed to provide real-time analysis when a crime takes place, though.

*Id.* at 334 (record citations omitted).  The AIR program was the product of a partnership between BPD and private contractor PSS.  *Id.* at 333.  (ECF No. 4 ¶ 5.)

On April 9, 2020, a group of grassroots community advocates in Baltimore filed a lawsuit challenging the constitutionality of the AIR program under the Fourth Amendment.  *Leaders of a Beautiful Struggle III*, 2 F.4th at 335.  The plaintiffs there sought a temporary restraining order and preliminary injunction to enjoin operation of the AIR program.  *Id.*  On April 24, 2020, the Honorable Judge Richard D. Bennett of this court denied the motion, concluding, *inter alia*, that the plaintiffs had not established they were likely to succeed in showing the imagery data captured by the AIR program violates the Fourth Amendment.  *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 456 F. Supp. 3d 699, 717 (D. Md.), *aff'd,* 979 F.3d 219 (4th Cir. 2020), *on reh'g en banc,* 2 F.4th 330 (4th Cir. 2021), and *rev'd and remanded,* 2 F.4th 330 (4th Cir. 2021) ("*Leaders of a Beautiful Struggle I*").  The plaintiffs appealed and, on November 5, 2020, the Fourth Circuit

2

affirmed the district court's order, concluding that the AIR program did not invade a reasonable expectation of privacy under the Fourth Amendment. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 229 (4th Cir. 2020), *on reh'g en banc,* 2 F.4th 330 (4th Cir. 2021) ("*Leaders of a Beautiful Struggle II*"). In December of 2020, the Fourth Circuit granted the petition for rehearing en banc. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 831 F. App'x 662 (4th Cir. 2020). Then, on June 24, 2021, the Fourth Circuit issued its decision on rehearing, holding that, "because the AIR program enables police to deduce from the whole of individuals' movements," "accessing its data is a search, and its warrantless operation violates the Fourth Amendment." *Leaders of a Beautiful Struggle III*, 2 F.4th at 333.

## B. The Investigation and Prosecution of Plaintiff

On May 22, 2020, Steven Lamont Clark, Sr., was murdered in front of his home in the Forest Park neighborhood of West Baltimore. (ECF No. 29 ¶ 4.) The suspect shooter left the scene in a "blue pick-up style truck." *Id.* In the course of investigating the suspect vehicle, BPD Defendants used aerial surveillance by way of the AIR program to discover the suspect vehicle was owned by Enterprise Rent-A-Car. *Id.* ¶ 5. In particular, BPD Detective Tavon McCoy submitted a "supplemental request" to utilize the aerial surveillance footage, which Commissioner Harrison approved, despite the fact that use of the footage violated a Memorandum of Understanding ("MOU") between Defendants and PSS, as a supplemental request was only to be "utilized under extraordinary or exigent circumstances." *Id.* ¶ 8. Importantly, "the footage from the spy plane was utilized to surveil the blue truck days before the crime occurred and miles away from where it took place." *Id.* Ultimately, "[t]he evidence obtained from the spy plane indicated that the vehicle had stopped at a location associated with a person of interest in regard to Clark's murder, three blocks away from where the incident took place." *Id.* ¶ 8.

3

On July 9, 2020, Defendants arrested Plaintiff for Clark's murder.  (ECF No. 29 ¶ 4.) Plaintiff asserts that, upon his arrest, "Defendants did not provide a sufficient basis for their allegations that Plaintiff had murdered Clark but based their allegations on unspecified information ascertained from aerial surveillance conducted by [the] spy plane." *Id.* ¶ 6.  The basis of the arrest was not disclosed to Plaintiff in his charging documents; although the documents did include "a vague description of 'video evidence.'" *Id.* ¶¶ 7, 9.  Ultimately, Plaintiff was charged by indictment with first-degree murder, use of a firearm in a violent crime, and possession of a firearm by a person with a felony conviction.  *Id.* ¶ 10.

Plaintiff's trial was scheduled to begin on October 24, 2022.  (ECF No. 29 ¶ 12.)  But on that day, the Baltimore City State's Attorney's Office "suddenly dropped the case," citing a "missing key witness." *Id.* ¶¶ 12, 14.  Defendants' use of the "spy plane" had not been disclosed to Plaintiff or his defense counsel prior to trial.  *Id.* ¶ 13.  It appears from the Complaint that Plaintiff remained incarcerated from his arrest until dismissal of his charges, at which time he was released.  *Id.* ¶¶ 15, 18.  On November 16, 2022, Defendants re-indicted Plaintiff, and he was placed on house arrest until his trial in August 2023.  *Id.*

On August 23, 2023, at the close of Plaintiff's trial, the Honorable Judge John A. Howard of the Circuit Court for Baltimore City, Maryland, granted Plaintiff's motion for judgment of acquittal, concluding "there had been no sufficient evidence presented by Defendants to identify Plaintiff as the person who killed Steven Clark." (ECF No. 29 ¶ 16.)  Plaintiff's defense counsel remained unaware of the aerial surveillance evidence against Plaintiff until he was contacted by media related to a story.  *Id.* ¶ 17.

As a result of Defendants' actions, Plaintiff alleges he "spent two years incarcerated in the Baltimore City Detention Center and another on home detention," "lost his job," "became

estranged from his young daughter," "caught COVID-19 three times," "remained estranged from his family," and "suffered serious mental health deterioration." (ECF No. 29 ¶ 18.)

On August 19, 2024, Plaintiff initiated this action against Defendants in the Circuit Court for Baltimore City, Maryland. (ECF No. 4.) Then-Defendant Office of the State's Attorney for Baltimore City removed the action to this court on October 21, 2024. (ECF No. 1.) The instant Defendants previously filed a motion to dismiss Plaintiff's original complaint, which this court granted in part and denied in part. (ECF Nos. 11, 21, 22.) Following that, Plaintiff sought leave to file the Amended Complaint, which Defendants did not oppose. (ECF Nos. 26, 27.) Plaintiff's Amended Complaint contains two counts:

> Count I: Violation of the Fourth Amendment—42 U.S.C. § 1983 against all Defendants; and
>
> Count II: "*Monell* Claim"[2] seemingly against all Defendants.

(ECF No. 29 ¶¶ 22–34.) On September 10, 2025, Defendants filed the instant Motion to dismiss Count I in its entirety, to dismiss Count II as against Defendant Harrison, and to dismiss Count II to the extent it is based on any *Monell* theory except express policy. (ECF No. 30.)

## II.    LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Papasan v. Allain*, 478 U.S. 265, 283 (1986)). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A court decides whether

---

[2] As discussed at greater length below, a *Monell* claim refers to a claim to hold a municipal entity liable under 42 U.S.C. § 1983

this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'" *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citation modified) (quoting *Twombly,* 550 U.S. at 555, 570).  The plausibility requirement is not "a probability requirement but rather a mandate that a plaintiff 'demonstrate more than a sheer possibility that a defendant has acted unlawfully." *In re Birmingham*, 846 F.3d at 92 (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)).  Reliance on "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient.  *Twombly*, 550 U.S. at 555.

## III.    ANALYSIS

### A. Plaintiff's Voluntary Dismissal

The court turns first to Plaintiff's representations regarding his claims in response to the instant Motion.  Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), a plaintiff may voluntarily dismiss a claim without order of the court by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment."  FED. R. CIV. P. 41(a)(1)(A)(i).  In Plaintiff's response to Defendants' Motion, Plaintiff states:

> The motion should be granted as to Count I's direct § 1983 claim against BPD and any individual capacity claims against Harrison, but denied as to the preservation of viable *Monell* theories. Count II adequately states a *Monell* claim that can proceed regardless of qualified immunity determinations for individual defendants.

> This approach aligns with the Court's previous ruling and allows Plaintiff to pursue the properly pled municipal liability theory while

6

eliminating legally insufficient direct claims. The *Monell* claim provides an adequate vehicle for addressing the alleged constitutional violations arising from the AIR program's implementation and operation.

(ECF No. 31 at p. 2.)  Based on the foregoing, and where no answer or motion for summary judgment has yet been filed, the court construes Plaintiff's assertion that certain claims should be dismissed as a notice of voluntarily dismissal pursuant to Rule 41(a)(1)(A)(i).  Accordingly, the court will dismiss Count I against BPD and Counts I and II against Defendant Harrison in his individual capacity.[3]

Based on the foregoing, the remaining live arguments raised by Defendants in their Motion relate to claims against Defendant Harrison in his official capacity and the different *Monell* theories at issue.

### B.  Official Capacity Claims against Defendant Harrison

Defendant argues that, to the extent Counts I and II are brought against Defendant Harrison in his official capacity, they should be dismissed as duplicative.  (ECF No. 30-1 at p. 8–9.)  While "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658,

---

[3] Even were the court not to construe the response as a Rule 41 voluntary dismissal, these claims would be dismissed. First, the court previously determined that Defendant Harrison was entitled to qualified immunity. (ECF No. 21 at pp. 17–21.) Although Plaintiff's operative pleading was later amended, the "operative fact pattern" remains the same; amendment was merely "to clarify the legal basis" for his *Monell* claim. (ECF No. 26.) The court's determination that Defendant Harrison is entitled to qualified immunity from claims against him in his individual capacity is therefore unaffected by the amendment. Further, it is well known that for a municipality to be liable under § 1983, it must be "a 'moving force' behind the deprivation," such that its "'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (first quoting *Polk County v. Dodson,* 454 U.S. 312, 326 (1981); and then quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). A municipality thus may not be held liable on a respondeat superior theory. *Monell*, 436 U.S. at 691. Any direct claim against BPD or Defendant Harrison in his official capacity, therefore, fails as a matter of law. Apparently cognizant of the foregoing, Plaintiff allows that dismissal is appropriate.

690, n. 55 (1978)). "For purposes of Section 1983, these official-capacity suits are 'treated as suits against the [municipality].'" *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). A district court therefore "correctly dismisse[s] as duplicative [a § 1983 claim] against the individual defendants in their official capacities." *Z.G. by & through C.G. v. Pamlico Cnty. Pub. Sch. Bd. of Educ.*, 744 F. App'x 769, 780 (4th Cir. 2018), *abrogated in part on other grounds, Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142 (2023).

Indeed, this court has repeatedly dismissed claims against public officials in their official capacities where such claims are duplicative of a *Monell* claim against the municipality.[4] *See, e.g.*, *Settles v. Scott*, No. SAG-25-01838, 2025 WL 3466852, at *7 (D. Md. Dec. 3, 2025); *Neal-Williams v. Addison*, No. CV 21-3280 PJM, 2024 WL 1995034, at *4 (D. Md. May 6, 2024); *Mealey v. Baltimore City Police Dep't*, No. 1:21-CV-02332-JRR, 2023 WL 2023262, at *9 (D. Md. Feb. 15, 2023); *Cottman v. Baltimore Police Department*, No. 21-CV-00837-SAG, 2022 WL 137735, at *5 (D. Md. Jan. 13, 2022); *Grim v. Baltimore Police Dep't*, No. CV ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019). *See also Lilly v. Baltimore Police Dep't*, 694 F. Supp. 3d 569, 591 (D. Md. 2023) (noting that '[t]o the extent that Plaintiffs assert either of their § 1983 claims (Counts 1 and 2) against either Nadeau and/or Lekeshia Blue in their official capacities, those claims are duplicative of the *Monell* claim against BPD because 'an official capacity claim . . . is a claim against a government entity of which an agent is an officer'" (quoting *Graham*, 473 U.S. at 165 (1985))).

---

[4] While there may be instances where the court declines to dismiss a duplicative claim, *see, e.g.*, *Jennings v. Frostburg State Univ.*, No. CV ELH-21-656, 2021 WL 5989211, at *10 (D. Md. Dec. 16, 2021), the court is not persuaded such circumstances exist here, especially where Plaintiff does not substantively oppose dismissal on this basis or otherwise offer any argument on the topic.

Because any § 1983 claim against Defendant Harrison in his official capacity is duplicative of Plaintiff's claim against BPD, and Plaintiff fails to respond to the argument—and thus concedes the point, *see Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) (noting that "[i]n failing to respond to [defendant's] argument," the plaintiff "concedes the point"); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (explaining that a plaintiff "abandon[s]" her claim where she fails to respond to argument)—all claims against Defendant Harrison in his official capacity will be dismissed.

## C. *Monell* Theories of Liability

Defendants also argue that, to the extent Plaintiff seeks to assert a *Monell* claim under any theory except the express policy theory, he fails to state a claim. (ECF No. 30-1 at pp. 11–13.) As the court explained in its previous memorandum opinion, the Supreme Court held in *Monell v. Department of Social Services* that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)). Accordingly, municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. Indeed, for *Monell* municipal liability to attach, "a plaintiff must show that the municipality's policies were 'the moving force behind a deprivation of federal rights.'" *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 182 (4th Cir. 2023); *see* footnote 3, *supra.*

Thus, a plaintiff seeking to impose liability on a municipality under § 1983 "must prove that 'action pursuant to official municipal policy' caused [his] injury." *Connick*, 475 U.S. at 60

(quoting *Monell*, 436 U.S. at 691).   A plaintiff may allege four types of policies, customs, or

practices for which a municipality may be held liable:

> (1) through an express policy, such as a written ordinance or
> regulation; (2) through the decisions of a person with final
> policymaking authority; (3) through an omission, such as a failure
> to properly train officers, that manifest[s] deliberate indifference to
> the rights of citizens; or (4) through a practice that is so persistent
> and widespread as to constitute a custom or usage with the force of
> law.[5]

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217

(4th Cir. 1999)).

The court does not construe Plaintiff's Amended Complaint to proceed, or seek to proceed,

on a failure to train or condonation theory.   Plaintiff makes no reference to the training of officers

(or lack thereof), and he discusses the AIR program as an express policy as opposed to some

widespread, customary practice.[6]   Accordingly, even if Plaintiff intended to assert such theories,

his allegations fail to state plausible claims under these theories.   *See, e.g.*, *Palma v. Montgomery*

*Cnty.*, 598 F. Supp. 3d 288, 298 (D. Md. 2022) (providing that "[a] failure to train *Monell* theory

requires a plausible demonstration that (1) the nature of the training was insufficient in some

particularized manner; (2) the insufficiency of the training was a deliberate or conscious choice;

and (3) a causal relationship existed between the failure-to-train and the injuries suffered"); *Corbitt*

*v. Baltimore City Police Dep't*, No. CV RDB-20-3431, 2022 WL 846209, at *9 (D. Md. Mar. 22,

---

[5] The fourth type is commonly referred to as a "condonation theory" of liability.

[6] The court does not read Plaintiff's Complaint to assert any condonation theory based upon withholding exculpatory evidence obtained through the AIR program.   Plaintiff's allegation reads in relevant part: "[T]he BPD withheld exculpatory evidence obtained through the AIR program, violating his due process rights. This failure to disclose material evidence further demonstrates the causal link between the unconstitutional policy and the Plaintiffs injuries." (ECF No. 29 ¶ 32.)  Plaintiff's allegation pertains to the causal link between the AIR program and his constitutional violation, *see Connick v. Thompson*, 563 U.S. 51, 60 (2011); it does not give voice to a separate liability theory.  This is further illustrated by Plaintiff's failure to allege any facts in support of a widespread pattern of unconstitutional conduct of this nature.  *See Owens v. Balt. City State's Attys. Office,* 767 F.3d 379, 402 (4th Cir. 2014).   The court therefore need not reach Defendants' arguments about Plaintiff's failure to plead a "*Brady*-based withholding claim." (ECF No. 30-1 at pp. 13–16.)

10

2022) ("Under the 'condonation' theory, unlike the 'express policy' theory, a plaintiff need not reference any specific written policy when making their claim—instead, it is sufficient to plead sufficient facts that demonstrate the existence of a widespread pattern or practice.").

In contrast, Plaintiff's allegations do appear to support a final policymaker theory.[7] "[A] municipality can be held liable for constitutional harms stemming from a policy or custom instituted by the 'official actions' of municipal officials with 'final policymaking authority,' or those officials who 'have the responsibility and authority to implement *final* municipal policy with respect to a particular course of action.'" *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 308 (D. Md. 2020) (emphasis in original) (quoting *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 522-23 (4th Cir. 2000)). "A 'governmental unit may create an official policy by making *a single decision* regarding a course of action in response to particular circumstances' so long as that governmental unit possessed 'final authority to create official policy.'" *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554 (4th Cir. 2018) (emphasis in original) (citing *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).

"[I]n assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Id.* at 554–55 (citing *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)). "If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy." *Id.* at 555 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). "A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lytle v. Doyle*, 326 F.3d 463, 472

---

[7] Such a theory would seem to be in the alternative to an express policy theory.

(4th Cir. 2003).   As with all *Monell* claims, reliance on a final policymaker theory requires identification of the specific policy, attribution of the policy to the municipality, and an affirmative link between the policy and the plaintiff's specific rights violation.  *See Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

Plaintiff alleges facts to support such a theory here.  He identifies the specific "policy" at issue—Defendant Harrison's decisions with regard to the AIR program and expansion of its scope contrary to the MOU; he attributes the policy to an alleged final policymaker through specific factual allegations—that Defendant Harrison "acted as a policymaker whose decisions and directives" included his "approval of the AIR program and subsequent expansion of its scope, in violation of the Memorandum of Understanding governing its use"; and he alleges facts to support an affirmative link between the purported policy and his specific rights violation—that it resulted in his wrongful detention, loss of employment, and emotional distress.[8]  (ECF No. 29 ¶¶ 24–34.) The court therefore finds Plaintiff alleges a plausible *Monell* claim based on a final policymaker theory.  The court will therefore deny the Motion on that basis.

## IV.    **CONCLUSION**

For the reasons set forth herein, by separate order, Plaintiff's Count I against BPD and Counts I and II against Defendant Harrison in his individual capacity are considered voluntarily dismissed pursuant to Rule 41(a)(1)(A)(i); and the Motion will be granted as to Counts I and II to the extent they raise claims against Defendant Harrison in his official capacity.  The Motion will also be granted as to Count II based on failure to train and condonation theories and denied based

---

[8] Contrary to Defendants' argument, Plaintiff does allege that Defendant Harrison had "involvement in the investigation of Plaintiff's arrest or in the AIR program's use in connection with that arrest." (ECF No. 30-1 at p. 12.) *See* ECF No. 29 ¶¶ 8, 19, 27–29.

on a final policymaker theory.  The Motion will otherwise be denied as moot.[9]  For clarity, Plaintiff's Amended Complaint (ECF No. 29) will proceed solely on Count II based on express policy and final policymaker theories against Defendant BPD.


July 16, 2026

/S/

_____
Julie R. Rubin
United States District Judge

---

[9] Defendants seek dismissal with prejudice.  The court declines to dismiss this action with prejudice. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 292 (4th Cir. 2018) (stating that "the nature of dismissal" is left to "the sound discretion of the district court").